**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES KNOWLES, | ) | CASE NO.  4:09-cv-2540 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, James Knowles, *pro se*, challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), denying Plaintiff's applications for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.* (the "Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Commissioner's final decision should be AFFIRMED.

1

## I.   PROCEDURAL HISTORY

On October 24, 2005, Plaintiff filed an application for SSI alleging a disability onset date of January 1, 2000.  (Tr. 13.)  The claim was denied initially and upon reconsideration.  (Tr. 13.)  Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ").  (Tr. 13.)  Plaintiff's hearing was held on February 17, 2009.[1]  (Tr. 13.)  Plaintiff was represented by counsel and testified.  (Tr. 13.)  A vocational expert ("VE") also testified.  (Tr. 13.)  On April 10, 2009, the ALJ found Plaintiff not disabled under the Act.  (Tr. 21.)  The Appeals Council declined to review the ALJ's decision; therefore, the ALJ's decision became the Commissioner's final decision.  (Tr. 5.)  On October 30, 2009, Plaintiff timely filed this case *pro se* in the District Court for the Northern District of Ohio.  (Doc. No. 1.)

Plaintiff asserts two assignments of error:  (1) the ALJ erroneously found that Plaintiff had "not been hospitalized or sought emergency care due to his mental problems," in his assessment of whether Plaintiff met or medically equaled a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P (the "Listings"); and (2) the ALJ erroneously found that Plaintiff "was dismissed from the pain clinic in October of 2008 for failing to submit to a urine drug test and manipulative and abusive behavior," in his assessment of the record evidence.  (Pl.'s Statement of Errors 1, Doc. No. 16 Attach 1.)[2]

---

[1]  Plaintiff had also applied for Title XVI benefits on August 15, 2000, and March 21, 2005.  (Tr. 13.)  These applications were denied and never appealed.  (Tr. 13.)  Therefore, those applications were not reopened by the ALJ.  (Tr. 13.)

[2]  Plaintiff also notes that he was unable to locate his medical records documenting his bicycle accident on June 10, 2006, and that "it seems that this

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was forty-four years old at the time of the ALJ's decision.  (Tr. 84-85.)
He completed the tenth grade in high school and obtained a General Education
Diploma ("GED").  (Tr. 139.)  He had past relevant work experience as a laborer.  (Tr.
666-67.)

### B.    Medical Evidence

#### 1.    Mental Condition

Plaintiff has a long history of substance abuse (*see, e.g.*, Tr. 206), and mental
problem including depression and anxiety that sometimes culminated in suicidal
ideation (*see, e.g.*, Tr. 204).  Plaintiff occasionally sought emergency care for his
mental problems; for example, on July 5, 2000, Plaintiff presented to Trumbull Memorial

---

information would be important," as "some of his primary medical issues . . .
stem from that accident."  (Pl.'s Statement of Errors 4.)  Furthermore, Plaintiff
notes that information from two "Medical Functional Capacity Assessment"
forms that he attached to his Statement of Errors—but that do not appear in
the record—"may be of use since it speaks to the claimant's areas of
limitation."  (Pl.'s Statement of Errors 4.)  Plaintiff does not explain how this
evidence relates to his formal assignments of error or otherwise supports a
judgment in his favor.  Although Plaintiff represents himself *pro se*, and *pro se*
plaintiffs enjoy the benefit of a liberal construction of their pleadings, s*ee
Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999), this Court is not required
to make Plaintiff's arguments for him, as such a mandate would "require the
courts to explore exhaustively all potential claims of a *pro se* plaintiff, . . . [and]
would . . . transform the district court from its legitimate advisory role to the
improper role of an advocate seeking out the strongest arguments and most
successful strategies for a party."  *Crawford v. Crestar Foods*, 210 F.3d 371
(Table), No. 98-3144, 2000 WL 377349, at *3 (6th Cir. 2000) (quoting *Beaudett
v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).  Therefore, the Court
need not speculate as to what legal arguments Plaintiff might make from these
observations.  Furthermore, Plaintiff does not explain any basis for considering
this evidence.

Hospital's emergency room with complaints of depression.  (Tr. 262.)

Plaintiff had received counseling and treatment at Meridian Services, Inc., from psychiatrist Dr. Michael Bengala, M.D., and various counselors since June 19, 2001. (Tr. 503, 484.)

On December 15, 2005, Ms. Cara Stephens, P.C.C., a counselor at Meridian Services, Inc., reported on Plaintiff's condition upon the request of the Bureau of Disability Determination.  (Tr. 484-85.)  Ms. Stephens indicated that Dr. Bengala diagnosed Plaintiff with an anxiety disorder, alcohol dependence in early partial remission, and hypertension; and indicated that Dr. Bengala assigned Plaintiff a Global Assessment of Functioning ("GAF") score of between 75 and 80.[3]  (Tr. 484.)

Ms. Stephens reported the following about Plaintiff's condition.  Plaintiff had abstained from alcohol for more than one year, which was great progress for him.  (Tr. 485.)  He was learning healthier coping techniques, but still had anxiety and depression in response to frustration with life circumstances not being as he would like them.  (Tr. 485.)  Plaintiff's anxiety and depression would sometimes lead to "self-sabotaging behaviors," which made it difficult for Plaintiff to maintain employment.  (Tr. 485.) Although Plaintiff had sought employment through the Bureau of Vocational Rehabilitation several times, each time ended prematurely when Plaintiff failed to follow through with the program.  (Tr. 485.)  Plaintiff had difficulty maintaining employment

---

[3] A GAF score between 71-80 indicates no more than slight impairment in social, occupational, or school functioning.  If symptoms are present, they are transient and expect able reactions to psychosocial stressors.  *See* Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th ed. rev., 2000).

4

because he suffered anxiety when he was around new people or in unfamiliar situations.  (Tr. 485.)

On March 7, 2006, psychologist Dr. Donald Degli performed a psychological evaluation of Plaintiff at the request of the Bureau of Disability Determination.  (Tr. 448-50.)  Dr. Degli diagnosed Plaintiff with Generalized Anxiety Disorder, Depressive Disorder, Alcohol Dependancy in sustained remission, Borderline Personality Disorder, and a blood pressure disorder.  (Tr. 450.)  Dr. Degli assigned Plaintiff a GAF score of 60.[4]  (Tr. 450.)  Dr. Degli indicated that Plaintiff had received inpatient treatment for his mental issues at several hospitals in the past.  (Tr. 448.)

Dr. Degali provided the following assessment of Plaintiff's mental functioning. Plaintiff is intolerant and would work best in an isolated setting.  (Tr. 450.)  He is likely to have difficulty meeting the demands of interacting with peers, supervisors, or the adult public in a competitive work environment.  (Tr. 450.)  He is able to understand, remember, and follow directions and do routine tasks for meaningful periods of time in a competitive work environment.  (Tr. 450.)  His ability to maintain attention, concentration, persistence, and pace in a competitive work environment is impaired by his mood disturbance.  (Tr. 450.)  Moreover, his ability to withstand the stresses and pressures of a competitive work environment is impaired by his mood disturbance.  (Tr. 450.)  In sum, Plaintiff is mildly to moderately impaired in his mental ability to meet the

---

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See* Diagnostic and Statistical Manual of Mental Disorders, *supra*, at 34.

demands of competitive adult employment.  (Tr. 450.)

On March 31, 2006, state agency psychological consultant Karen Stailey[5] performed a psychiatric review (Tr. 463-76), and mental residual functional capacity ("RFC") assessment of Plaintiff (Tr. 459-61).  In her psychiatric review, Ms. Stailey determined that Plaintiff suffered mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and suffered one or two episodes of decompensation, each of extended duration.  (Tr. 473.)  In her mental RFC assessment, Ms. Stailey determined that Plaintiff was moderately limited in his abilities to maintain attention and concentration for extended periods of time; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 459-60.)  Ms. Stailey found that Plaintiff was otherwise not significantly limited.  (Tr. 459-60.)  As to activities of daily living, Ms. Stailey reported that Plaintiff was independent with personal care, prepared simple meals, cleaned dishes, did laundry, and did his own grocery shopping.  (Tr. 461.)

On December 6, 2006, Ms. Stephens reported that during the past year, Plaintiff had made significant progress in managing his mental health symptoms and attending

---

[5] The record does not indicate Ms. Stailey's credentials.

his medical appointments.  (Tr. 478-79.)  However, Ms. Stephens reported that Plaintiff's depressive symptoms were exacerbated after June 10, 2006, when Plaintiff had a bicycle accident that required a short stay at the hospital and caused Plaintiff continuous pain.  (Tr. 478.)  Ms. Stephens indicated that Plaintiff also complained of anxiety in social situations.  (Tr. 479.)

Ms. Stephens indicated the following about Plaintiff's mental functioning.  Plaintiff reported that he had difficulty remembering things, but demonstrated no difficulty understanding Ms. Stephens's counseling opinions.  (Tr. 479.)  Plaintiff's ability to concentrate, as well as his persistence, is impaired when he is depressed or suffering a significant amount of anxiety or stress.  (Tr. 479.)  Plaintiff reported that he continued to have difficulty with social interaction and tends to have a support person accompany him to necessary appointments.  (Tr. 479.)  Furthermore, Ms. Stephens reported that Plaintiff believed his ability to adapt to unfamiliar or new situations was poor.  (Tr. 479.)  Ms. Stephens concluded by highlighting that Plaintiff had been sober for over two years.  (Tr. 479.)

On January 11, 2007, a psychiatric review was performed by a psychologist whose name is not clear in the record.  (Tr. 511-525.)  The psychologist indicated that Plaintiff suffered only mild restrictions of activities of daily living, and difficulties in maintaining social functioning, concentration, persistence, or pace.  (Tr. 521.)  The psychologist further indicated that Plaintiff suffered no repeated episodes of decompensation.  (Tr. 521.)

On April 27, 2007, Dr. Bengala reported that Plaintiff was feeling better after talking with his counselor.  (Tr. 534-35.)  Dr. Bengala reported that Plaintiff was less

7

frustrated, his mood had improved, he had good eye contact, and his speech had a normal flow.  (Tr. 534.)  Dr. Bengala indicated that Plaintiff had no delusions or hallucinations, and that Plaintiff's medications remained unchanged.  (Tr. 534.)

On July  2007, Dr. Bengala indicated that Plaintiff's impulsiveness was less with his psychiatric medications, and that Plaintiff remained sober.  (Tr. 533.)  Dr. Bengala further indicated that Plaintiff had a neutral mood, good eye contact, and normal speech, and that Plaintiff did not report hallucinations or delusions.  (Tr. 533.)

On August 17, 2007, however, Dr. Bengala indicated that Plaintiff "continued to be frustrated with system" because he suffered pain and did not understand why his physicians would not prescribe him opiates.  (Tr. 532.)  Dr. Bengala further indicated that Plaintiff was depressed because of his symptoms, although Plaintiff was not suicidal.  (Tr. 532.)

Plaintiff did not attend several scheduled appointments with Dr. Bengala or Dr. Vincent Paolone, M.D., at Meridia Services between the end of 2007 and through 2008.  (Tr. 528.)  On August 22, 2008, Plaintiff presented to Dr. Paolone.  (Tr. 531.)  Dr. Paolone indicated that Plaintiff suffered a mood disorder and depression associated with his chronic pain.  (Tr. 531.)

On February 11, 2009, Ms. Stephens wrote a letter to Plaintiff's attorney and reported the following.  Plaintiff had "made improvements in learning how to manage his mental health symptoms and now has approximately 4 ½ years of sobriety from alcohol."  (Tr. 631.)  Plaintiff's depression became worse after his bicycle accident in June 2006, which sometimes lead Plaintiff to voice the opinion that he would rather die than suffer the pain caused by his accident; however, Plaintiff no longer voiced such

8

opinions.  (Tr. 631.)  Plaintiff's depression was still exacerbated from time to time by his life circumstances; for example, Plaintiff is unable to participate in the hobbies that he once enjoyed that provided an outlet for his depression and anxiety.  (Tr. 632.)  Plaintiff missed several counseling appointments at Meridian Services between the end of 2007 and through 2008 because he was unable to cope with the change from seeing Dr. Bengala to Dr. Paolone, he did not like Dr. Paolone, and his embarrassment about missing appointments deterred him from rescheduling appointments.  (Tr. 632.)

### 1.    Physical Condition

On March 15, 2006, Dr. Prabhudas R. Lakhani, M.D., assessed Plaintiff's physical functioning and ranges of motion for the Bureau of Disability Determination. (Tr. 451-57.)  Dr. Lakhani indicated that Plaintiff had full ranges of motion in all of his joints and spine.  (Tr. 452-53.)  Dr. Lakhani reported that Plaintiff had normal gait and ambulation (Tr. 455), was able to walk up to a mile (Tr. 456), and could carry ten pounds for short distances before becoming short of breath (Tr. 455).

On December 6, 2006, Ms. Stephens reported that Plaintiff had been in a bicycle accident on June 10, 2006, that required a short stay at the hospital and caused Plaintiff continuous pain.  (Tr. 478.)

On March 9, 2007, Dr. Bengala reported that Plaintiff had been in a bicycle accident and that the accident caused "problems" with Plaintiff's hands.  (Tr. 536.) Months earlier, on January 19, 2007, Dr. Bengala reported that Plaintiff underwent tests at the Cleveland Clinic that showed stenosis at C5-6 vertebrae, which caused Plaintiff's hand symptoms.  (Tr. 537.)  Dr. Bengala indicated that Plaintiff was "ambivalent about neurosurgery."  (Tr. 536.)  However, on April 20, 2007, Dr. Bengala indicated that

surgery had been scheduled but was rescheduled because of Plaintiff's high blood pressure.  (Tr. 535.)

On September 17, 2007, Plaintiff presented to Dr. Evelyn Oteng-Bediako, M.D., a physician at the Doctors Pain Clinic with complaints of chronic pain in his neck, hands, back, and legs.  (Tr. 603-07.)  Dr. Oteng-Bediako indicated the following. Plaintiff reported that his pain began after a bicycle accident on June 10, 2006; and that he had been scheduled for surgery in January 2007, but that the surgery had been cancelled because of his high blood pressure.  (Tr. 603.)  He was no longer interested in surgery because he had no guarantee that it would relieve his pain symptoms.  (Tr. 603.)  Plaintiff's pain was continuous and unbearable, and was associated with sleeplessness, crying, irritability, and an inability to perform tasks such as tying his shoes or doing regular activities of daily living.  (Tr. 604.)

Only Plaintiff's Vicodin medication helped relieve Plaintiff's pain, but the dosage he was prescribed was not adequate to relieve his pain so he unilaterally escalated his dosages.  (Tr. 603.)  He tried physical therapy and home exercises to relieve his pain, but did not obtain relief from them.  (Tr. 604.)  He had not received any cervical epidural steroid injections.  (Tr. 604.)  He had received a left ulnar nerve block, but the nerve block did not help with his pain.  (Tr. 604.)  Plaintiff was not interested in interventional procedures, but rather desired to receive only medication treatment for his pain.  (Tr. 604.)

On examination, Plaintiff was not in obvious distress, was alert and oriented, and answered questions appropriately.  (Tr. 605.)  He had elevated blood pressure.  (Tr. 605.)  He had normal ranges of motion in his neck, and had normal muscle strength in

10

his arms.  (Tr. 605.)  He had abnormal movement in his fingers, however, and a weak

hand grip.  (Tr. 605.)  He had normal motor strength in his lower extremities, but

exhibited an abnormal tandem gait; however, he did not use any assistive device to

walk.  (Tr. 605.)  He had no muscle atrophy.  (Tr. 604-05.)

Dr. Oteng-Bediako diagnosed Plaintiff with cervical canal stenosis with C5-6 cord

compression, cervical myelopathy, low back pain secondary to lumbar degenerative

disc disease with lumbar radiculopathy, ulnar neuropathy, and high blood pressure.  (Tr.

606.)  Dr. Oteng-Bediako indicated that Plaintiff might suffer "pseudo addiction" (Tr.

604), warned Plaintiff to comply with his Vicodin dosage, and discussed other

non-narcotic regimens to help control Plaintiff's pain (Tr. 606).

On October 10, 2008, Dr. Oteng-Bediako sent a letter to Plaintiff indicating that

the Doctors Pain Clinic was terminating its treatment relationship with Plaintiff because

Plaintiff exhibited manipulative or abusive behavior, and because Plaintiff refused to

take a urine drug test on April 4, 2008.  (Tr. 601-02.)

Plaintiff indicated in his Statement of Errors that he was not able to obtain any

medical records that documented his bicycle accident.  (Pl.'s Statement of Errors 4.)

### 3.    Additional Evidence Presented by Plaintiff in His Statement of Errors

The following evidence was attached to Plaintiff's Statement of Errors (Doc. No.

16 Attach 1), but does not appear in the record.

On April 20, 2007, Dr. Bengala performed a "Medical Functional Capacity

Assessment" of Plaintiff.  (Pl.'s Statement of Errors 11.)  Dr. Bengala assessed Plaintiff

as follows.  Plaintiff was markedly limited in his abilities to carry out detailed

11

instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Pl.'s Statement of Errors 11.)  Plaintiff was moderately limited in his abilities to understand and remember simple and detailed instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  (Pl.'s Statement of Errors 11.)  Plaintiff was not significantly limited in all other areas of functioning.  (Pl.'s Statement of Errors 11.)  Furthermore, Plaintiff was unemployable, and Plaintiff's condition could be expected to last for twelve or more months.  (Pl.'s Statement of Errors 11.)

On October 24, 2008, Plaintiff's counselor, Ms. Stephens, wrote a letter to the Doctors Pain Clinic on behalf of Plaintiff requesting that the Doctors Pain Clinic revise its October 10, 2008, Discharge Note to indicate that Plaintiff had taken a urine drug test after he left the Clinic on April 10, 2008.  (Pl.'s Statement of Errors 16.)

Dr. Tracy L. Neuendorf revised Plaintiff's October 10, 2008, Dismissal Note from the Doctors Pain Clinic to indicate that the Doctors Pain Clinic terminated its

treatment relationship with Plaintiff for the following reasons:  "Manipulative/abusive behavior (SEE OTHER)," and "Other:  Patient was told to go for UDS on 4-10-08. Stated he would not go and was not coming back to our clinic.  He then did go and failed UDS."  (Pl.'s Statement of Errors 20.)

On April 17, 2009, psychologist Dr. Steven King, M.D., provided a "Medical Functional Capacity Assessment" of Plaintiff.  (Pl.'s Statement of Errors 8.)  Dr. King assessed Plaintiff as follows.  Plaintiff was markedly limited in his abilities to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  (Pl.'s Statement of Errors 8.)  Plaintiff was not significantly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Plaintiff was moderately limited in all other areas of functioning.  (Pl.'s Statement of Errors 8.)  Furthermore, Plaintiff was unemployable, and Plaintiff's condition could be expected to last for twelve or more months.  (Pl.'s Statement of Errors 8.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified to the following.  Plaintiff suffered constant pain because of a neck injury that resulted from a fall from a bicycle.  (Tr. 653, 655-57.)  He was able to turn his head to the left and right (Tr. 656), but his neck pain occasionally traveled down to his left shoulder.  (Tr. 657.)  His fingers and hands always hurt, and his fingers had a tingling sensation and were numb.  (Tr. 657.)  His elbows also hurt.  (Tr. 657.)  He frequently dropped things.  (Tr. 654.)  He could lift only ten pounds (Tr. 662), and needed help getting dressed and tying his shoelaces.  (Tr. 654.)

Nerve problems in Plaintiff's neck caused weakness in his legs.  (Tr. 653.)  He suffered pain and numbness in his left leg if he stood for more than ten minutes.  (Tr. 658.)  He could walk for about one hundred feet, but he could not climb stairs.  (Tr. 653.)  He had trouble bending at the waist and doing side to side twisting.  (Tr. 658).  He took Vicodin for pain, which gave him about sixty to ninety minutes of pain relief.  (Tr. 658-59.)

Plaintiff was not abusing either non-prescribed medications or alcohol.  (Tr. 650.)  The ALJ noted that the record indicated that Plaintiff was discharged from treatment at the Doctors Pain Clinic because he refused to take a urine drug test on April 10, 2008; however, Plaintiff testified that he only refused to take it because he thought it was unnecessary, and that he subsequently did take a urine drug test.  (Tr. 651-52.)

Plaintiff lived alone and had a cat.  (Tr. 657.)  He could sit for only ten minutes before he had to lie down, and he needed to stay in bed most of the time.  (Tr. 653.)

14

His girlfriend lives in the same building as he does and feeds his cat, does his laundry, cooks his meals, and cleans his dishes.  (Tr. 661-62.)

Plaintiff suffered depression all of his life (Tr. 664), and had a fear of crowds (Tr. 661).

### 2.    Vocational Expert Testimony

The ALJ offered the following hypothetical to the VE:

> I want you to consider an individual like this Claimant with the same age, education and work experience that has a residual functional capacity for light work as that term is defined in the regulations.  This individual must avoid all ladders, ropes and scaffolds, only occasional work above the shoulder on the left and [being right-hand dominant] occasional use of the left arm, on the left with the right shoulder and right arm being okay . . . . No repetitive use of the right and left hand for fine manipulation, must avoid moderate exposure to extreme cold, avoid work place hazards, is limited to simple, one, two-step routine procedures.  They're non-public and limited interaction with coworkers and supervisors.  This individual also cannot work in any occupation where there's production of, packaging of, manufacturing of or shipping of alcoholic beverages or non-prescription drugs.

(Tr. 667-68.)  The VE testified that such a person could perform work as a security guard (500,000 positions in the national economy), stock checker (81,000 positions in the national economy), and photocopying or other business machine operator (40,000 positions in the national economy).  (Tr. 668-69.)

The ALJ then offered a second hypothetical to the VE:  "Assume the exact same circumstances as hypothetical number one except that the RFC is sedentary as that term is defined in the regulations."  (Tr. 669.)  The VE testified that such a hypothetical individual could still perform work as a security guard monitoring surveillance systems (85,000 positions nationally).  (Tr. 670.)

The ALJ then offered a third hypothetical to the VE:

15

> I want you to consider an individual like this Claimant with the same age, education and work experience that has the residual functional capacity for . . . [s]edentary work as that term is defined in the regulations.  This individual can only occasionally use the left arm for reaching and above shoulder work, only occasional use of the right and left hand for handling and fingering.  Is limited to simple, one, two-step, routine procedures that are non-public with no interaction with coworkers, limited interaction with supervisors and must preclude any occupations which include the manufacturing of, production of, packaging, shipping of alcohol or non-prescription drugs.

(Tr. 670.)  The VE testified that such a hypothetical person could still perform the surveillance system monitor job to which he testified.  (Tr. 670.)

Upon questioning from Plaintiff's attorney, the VE clarified that the surveillance system monitor job inherently allowed for a sit/stand option.  (Tr. 672.)  Plaintiff's attorney then offered an addition to the ALJ's hypothetical:  that the hypothetical person would be a half-hour late to work one day a week because of difficulties with keeping a schedule.  (Tr. 673.)  The VE testified that such a hypothetical person would probably not be able to perform the surveillance system monitor job.  (Tr. 673.)  Plaintiff's attorney then offered another addition to the ALJ's hypothetical:  that the hypothetical person would doze off at work once every one or two weeks.  (Tr. 673.)  The VE testified that such a person would probably not be able to keep his job as a surveillance system monitor.  (Tr. 673.)

The VE verified that his testimony was based on his training and experience (Tr. 675), and was consistent with the Dictionary of Occupational Titles ("DOT") (Tr. 669).

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when

16

she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-step process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets or medically equals a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's

impairment does prevent her from doing her past relevant work, if other work exists in

the national economy that the claimant can perform, the claimant is not disabled.  20

C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since October 24, 2005, the application date.

2.    The claimant has the following severe impairments: Cercival Myelopathy, Anxiety, Depression, Cervical Canal Stenosis with C5-C6 Cord Compression, Degenerative Disc Disease, Ulnar Neuropathy, and Hypertension.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work . . . except he is unable to climb ropes, ladders, and scaffolds.  He should avoid overhead work with his left arm.  The claimant cannot use his left hand for repetitive fine manipulation.  He should avoid extreme cold and workplace hazards such as heights, moving, machinery, and open flame.  The claimant is limited to simple, routine, repetitive work with limited and superficial contact with co-workers and supervisors and no contact with the public.  He should avoid work that involves the production, manufacture, or shipping of alcohol and prescription drugs.

5.    The claimant is unable to perform any past relevant work.

. . . . .

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability . . . since October 24, 2005, the date the application was filed.

18

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, nor weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

Plaintiff is representing himself *pro se*.  *Pro se* plaintiffs enjoy the benefit of a liberal construction of their pleadings.  *See Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999).  However, this Court is not required to make Plaintiff's arguments for him, as

19

such a mandate would "require the courts to explore exhaustively all potential claims of

a *pro se* plaintiff, . . . [and] would . . . transform the district court from its legitimate

advisory role to the improper role of an advocate seeking out the strongest arguments

and most successful strategies for a party."  *Crawford v. Crestar Foods*, 210 F.3d 371

(Table), No. 98-3144, 2000 WL 377349, at *3 (6th Cir. 2000) (quoting *Beaudett v. City

of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

> **B.      The ALJ's Assessment of Whether Plaintiff Met or Medically
>              Equaled an Impairment in the Listings**

Plaintiff argues that the ALJ erroneously found that Plaintiff had not been

hospitalized or sought emergency care for his mental problems in his assessment of

whether Plaintiff medically equaled a listed impairment in the Listings.  For the reasons

set forth below, the Court finds that, although the record indicates that the ALJ

erroneously found that Plaintiff had never received hospitalization or emergency care for

his mental problems, this error was harmless.

At the third step of the disability determination process, a claimant will be found

disabled if he suffers from one or more impairments that meet or medically equal an

impairment in the Listings.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Here, the ALJ

determined that Plaintiff's mental problems did not meet or medically equal Listing 12.04

regarding affective disorders, and Listing 12.06 regarding anxiety-related disorders.  (Tr.

16.)  In so finding, the ALJ considered whether Plaintiff's alleged symptoms met those

Listings' "Paragraph B" criteria.  (Tr. 16.)  To satisfy either Listing's Paragraph B criteria,

there must be evidence that the claimant's impairment results in at least two of the

following four limitations:  (1) marked restrictions of activities of daily living; (2) marked

difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.  Listing 12.04(B); Listing 12.06(B).

The ALJ determined that Plaintiff suffered only mild restrictions in activities of daily living; moderate difficulties in social functioning; mild difficulties in concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 16-17.)  The ALJ based his determination that Plaintiff suffered no episodes of decompensation on his conclusion that "the claimant has not been hospitalized or sought emergency care due to his mental problems."  (Tr. 17.)

The ALJ's conclusion that Plaintiff had never been hospitalized or sought emergency room care for his mental problems is not accurate.  Dr. Degli indicated in his psychological evaluation of Plaintiff on March 7, 2006, that Plaintiff had received inpatient treatment for his mental issues at several hospitals in the past (Tr. 448); and Plaintiff presented to Trumbull Memorial Hospital's emergency room on July 5, 2000, with complaints of depression.  (Tr. 262.)  Plaintiff has not, however, articulated how this erroneous assessment of the record evidence invalidates the ALJ's conclusion that Plaintiff did not meet or medically equal the Listings.

Moreover, the ALJ's inaccurate evaluation of the record evidence as it relates to determining whether Plaintiff suffered any episode of decompensation was, at most, harmless error.  To satisfy the Paragraph B criteria for medically equaling the Listings, the ALJ was required to find that Plaintiff's symptoms met at least *two* of the four listed criteria.  Even though the ALJ's conclusion that Plaintiff did not suffer any episodes of decompensation was based on an inaccurate assessment of the record evidence, none

21

of the other three Paragraph B criteria were met.  Therefore, despite the ALJ's error, Plaintiff would not have satisfied enough of the Paragraph B criteria to medically equaling either Listing 12.04 or 12.06.  Therefore, remand on this assignment of error is not appropriate.

### C.     The ALJ's Assessment of the Record Evidence

In his assessment of the record evidence, the ALJ found that "The claimant was dismissed from the pain clinic in October 2008 for failing to submit to a urine drug test and manipulative and abusive behavior." (Tr. 19.)  Plaintiff contends that this finding was erroneous because it is not correct.  The Court disagrees.

The ALJ cited Exhibit 28F/59 in making his finding of fact.  (Tr. 19.)  Exhibit 28F/59 is a letter from Dr. Oteng-Bediako at the Doctors Pain Clinic to Plaintiff that indicated that the Doctors Pain Clinic's terminated its treatment relationship with Plaintiff for the following reasons:  "Manipulative/abusive behavior," and "REFUSING TO GO FOR A URINE DRUG SCREEN 4-10-08." (Tr. 601-02.)  Plaintiff confirmed during his hearing that he refused to take a urine drug test on April 10, 2008.  (Tr. 651.)

Plaintiff contends that the ALJ's finding was not correct because Plaintiff subsequently took a urine drug test on April 10, 2008.  Indeed, Plaintiff testified that he subsequently took a urine drug test after he left the Doctors Pain Clinic that day.  (Tr. 651.)  Moreover, Plaintiff attached to his Statement of Errors a revised Dismissal Note from Dr. Neuendorf at the Doctors Pain Clinic that indicates that the Doctors Pain Clinic terminated its treatment relationship with Plaintiff for the following reasons: "Manipulative/abusive behavior (SEE OTHER)," and "Other:  Patient was told to go for UDS on 4-10-08.  Stated he would not go and was not coming back to our clinic.  He

22

then did go and failed UDS."  Plaintiff does not, however, explain how the revised Dismissal Note helps rather than hinders his case.  The revised Dismissal Note does not contradict the ALJ's finding, but clearly corroborates the conclusion that Plaintiff refused to take a urine drug test on April 10, 2008, and was discharged from treatment for that reason.  Moreover, implicit in the requirement that Plaintiff take a drug test is the understanding that he must pass it, and the revised Dismissal Note indicates that he failed it.[6]

Because the revised Dismissal Note supports the ALJ's determination that Plaintiff was discharged from treatment at the Doctors Pain Clinic for refusing to take a urine drug test on April 10, 2008, and Plaintiff has not explained how the revised Dismissal Note actually helps his case, this assignment of error lacks merit.

---

[6] Furthermore, Plaintiff's revised Discharge Note does not appear in the record evidence.  Plaintiff does not explain whether this evidence was missing from the record; whether it was submitted to the ALJ during or after the hearing; whether the ALJ failed to consider the evidence; or, if it is new evidence, whether there is any basis to admit the evidence into the record for consideration.  As such, even if the evidence that Plaintiff is offering contradicted the ALJ's finding, there is no basis to conclude that the evidence is properly within this Court's review.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of

the Commissioner.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge


Date:  March 24, 2011


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the
Clerk of Court within fourteen (14) days after the party objecting has been served
with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to
file objections within the specified time may waive the right to appeal the District
Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas
v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

24